IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 1, 2003 Session

# CITY OF COOKEVILLE, TN by and through COOKEVILLE REGIONAL MED. CTR. v. WILLIAM M. HUMPHREY, M.D., ET AL.

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Putnam County**
**No. 99-219     Billy Joe White, Chancellor**

---

**No. M2001-00695-SC-R11-CV - Filed February 20, 2004**

---

In this declaratory judgment action, the plaintiff, a private act hospital authority established pursuant to Tennessee Code Annotated sections 7-57-601 to -604, seeks a declaration that it has the authority to enter into an exclusive contract for professional imaging services.  The defendants, four radiologists who currently have clinical privileges at the Imaging Department of a hospital operated by the plaintiff, filed a counterclaim.  We affirm the judgments of the lower courts, holding that Tennessee Code Annotated section 7-57-603 permits the hospital authority to enter into an exclusive provider contract, that the Board of Trustee's decision to close the staff of the Imaging Department did not violate the medical staff bylaws, and that the defendants are not legally or constitutionally entitled to a hearing if their clinical privileges are terminated upon the entry of an exclusive provider contract.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed**

JANICE M. HOLDER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., and WILLIAM M. BARKER, JJ., joined.

William H. West, Nashville, Tennessee, for the appellants, Daniel F. Coonce, M.D., William M. Humphrey, M.D., John P. Limbacher, M.D., George O. Mead, M.D., and Putnam Radiology, P.C.

Andrée Sophia Blumstein, Nashville, Tennessee, for the appellee, City of Cookeville by and through Cookeville Regional Medical Center.

William B. Hubbard, Nashville, Tennessee, for the amicus curiae, Tennessee Hospital Association.

Brian W. Holmes and David L. Steed, Nashville, Tennessee, for the amici curiae, American College of Radiology, American Medical Association, Medical Staff of Cookeville Regional Medical Center, Putnam County Medical Society, and Tennessee Medical Association.

**OPINION**

## I. FACTUAL AND PROCEDURAL BACKGROUND

Cookeville Regional Medical Center ("CRMC") is a private act hospital – commonly known as a "public hospital" – operated by the City of Cookeville, Tennessee, by and through the Cookeville Regional Medical Center Authority ("the Authority"). CRMC is established under the provisions of Tennessee Code Annotated sections 7-57-601 to -604, the Private Act Hospital Authority Act of 1996 ("Hospital Authority Act"). The defendants are four radiologists who are the sole shareholders in Putnam Radiology, PC ("Putnam"). The defendants are the only radiologists employed by Putnam. The defendants have staff privileges at CRMC's Imaging Department, which has historically operated as an "open staff" department. The Imaging Department staff is currently "open" to all qualified physicians with medical staff privileges who specialize in imaging services rather than "closed" pursuant to an exclusive provider contract.

In early 1999, the defendants, through an affiliated limited liability company, Premier Diagnostic Imaging Center, LLC ("Premier"), applied for a certificate of need to perform outpatient diagnostic imaging services in competition with CRMC. The Authority's Board of Trustees ("Board") decided to oppose Premier's certificate of need application. In addition, at its March 25, 1999 meeting, the Board determined that it would close the medical staff of CRMC's Imaging Department by seeking an exclusive provider contract for in-hospital imaging services.

A certificate of need was obtained by Premier in April of 1999.[1] That same month CRMC issued a request for a proposal ("RFP") from qualified radiology groups to operate and administer its Imaging Department under an exclusive provider contract. The medical staff of CRMC voted to support Putnam in becoming the providers of radiology services under an exclusive provider contract if an agreement could be reached.

Putnam objected to several provisions in the RFP, including a provision that medical staff access to the Imaging Department would terminate once an exclusive contract for the Imaging Department's operation and administration was executed. A letter written on behalf of Putnam stated, "It is our position that the medical staff bylaws of CRMC do not give the hospital the power to exclude radiologists on its staff from access to the devices and staff of the hospital."

In July of 1999, the plaintiff filed this action for declaratory judgment seeking a declaration of the right of CRMC to close the staff of its Imaging Department by means of an exclusive provider contract. The defendants filed a counterclaim, stating, among other things, that the medical staff bylaws of CRMC do not give CRMC power to exclude them from access to its Imaging Department and that the decision to close the staff of the Imaging Department was done in retribution against the defendants for their actions in obtaining a certificate of need for the establishment of an outpatient

---

[1] Premier began providing outpatient diagnostic imaging services in Cookeville in December of 1999. Premier is staffed solely by Putnam through the four defendant radiologists.

diagnostic imaging center in Cookeville. The case was heard on stipulated facts and cross motions for summary judgment. The competency of the defendant physicians is not at issue.

The trial court granted the plaintiff's motion for summary judgment. It found that the Hospital Authority Act permits the Authority to close the staff of a hospital department for competitive and economic reasons. In addition, the trial court found that the bylaws do not give the medical staff the right to veto a decision by the Authority to close the staff of a previously open department and that the defendants' contractual and due process rights were not violated. The Court of Appeals affirmed the judgment of the trial court.

We granted permission to appeal.

## II. ANALYSIS

The issues before this Court are as follows: 1) whether the Hospital Authority Act permits the Authority to close the staff of the Imaging Department at CRMC by means of an exclusive provider contract, thereby overruling previous case law; 2) if such closing is authorized, whether the Board's decision to close the staff of the Imaging Department violates the medical staff bylaws; 3) whether closing the staff of CRMC's Imaging Department in the absence of a hearing constitutes a breach of contract with the defendants; and 4) whether closing the staff of CRMC's Imaging Department in the absence of a hearing violates the due process or impairment of contract provisions of the state and federal constitutions.

We review an appeal from a grant of summary judgment de novo, according no presumption of correctness to the trial court's disposition. See Edwards v. Hallsdale-Powell Util. Dist., 115 S.W.3d 461, 464 (Tenn. 2003); Godfrey v. Ruiz, 90 S.W.3d 692, 695 (Tenn. 2002). Summary judgment is proper only when no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law. See Tenn. R. Civ. P. 56.04. In this case, the facts are stipulated, so that only questions of law are before the Court.

### A. Authority to Close the Staff of the Imaging Department

When construing a statute, this Court's role is "to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." Houghton v. Aramark Educ. Res., Inc., 90 S.W.3d 676, 678 (Tenn. 2002) (quoting Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)). Legislative intent is determined "from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning." State v. Flemming, 19 S.W.3d 195, 197 (Tenn. 2000). "When the statutory language is clear and unambiguous, we apply the plain language in its normal and accepted use." Boarman v. Jaynes, 109 S.W.3d 286, 291 (Tenn. 2003).

CRMC operates pursuant to the Hospital Authority Act. This act extends the powers granted to private act metropolitan hospital authorities under Tennessee Code Annotated sections 7-57-501

to -504 to private act hospital authorities.  See Tenn. Code Ann. § 7-57-603 (1998).  Tennessee Code Annotated section 7-57-502(c) provides in pertinent part that a metropolitan hospital authority, in the exercise of its powers, may "contract for or otherwise participate solely or with others" in furtherance of the hospital's operation.  Additionally, the plain language of this statute permits private act metropolitan hospitals to enter into a contract "*regardless of the competitive consequences [of the contract]*."  Tenn. Code Ann. § 7-57-502(c) (1998) (emphasis added).  Therefore, it is clear that private act metropolitan hospital authorities are statutorily authorized to execute exclusive provider contracts.  Tennessee Code Annotated section 7-57-603 explicitly states that "[a] private act hospital authority . . . has . . . all powers granted to private act metropolitan hospital authorities in title 7, chapter 57, part 5."  Thus, it is also clear that public hospitals share the power of metropolitan hospitals to enter into exclusive provider contracts.

Moreover, Tennessee Code Annotated section 7-57-501(b) explains the policy behind the Private Act Metropolitan Authorities Act of 1995.  According to this statute, the General Assembly found

> that the demand for hospital, medical and health care services is rapidly changing as is the way and manner in which such services are purchased and delivered; that the market for hospital and health care services is becoming increasingly competitive; and that the hospital and other health care providers need flexibility to be able to respond to changing conditions by having the power to develop efficient and cost-effective methods to provide for hospital, medical and health care needs.

Tenn. Code Ann. § 7-57-501(b) (1998).  The Legislature concluded that public hospitals in metropolitan areas are unable to effectively compete against private hospitals in the health care market without the removal of "legal constraints" and "limitations upon the power granted to public hospitals under existing law."  Id.

The Hospital Authority Act broadened the powers of public hospitals.  Eye Clinic, P.C. v. Jackson-Madison County Gen. Hosp., 986 S.W.2d 565, 568 (Tenn. Ct. App. 1998).  Case law at the time the Hospital Authority Act was passed held that private hospitals "have the right to exclude licensed physicians and surgeons from the use of the hospital for any cause deemed sufficient by its managing authorities."  Nashville Mem'l Hosp., Inc. v. Binkley, 534 S.W.2d 318, 320 (Tenn. 1976).  In our view, the Hospital Authority Act was clearly intended to overrule Henderson v. Knoxville, 9 S.W.2d 697 (Tenn. 1928), which held that the state's public hospitals could not exclude licensed physicians who comply with hospital rules and regulations.  The apparent intent of the Legislature was that public hospitals be authorized, like private hospitals, to contract exclusively with particular providers, even if it is to the disadvantage of other physicians.  The Hospital Authority Act shows this intent by specifically granting public hospitals the power previously granted to public hospitals in metropolitan areas to "contract for or otherwise participate solely or with others in the . . . operation of [a] hospital."  Tenn. Code Ann. § 7-57-502(c) (1998).  We therefore hold that the

Hospital Authority Act permits the Authority to close the staff of the Imaging Department of CRMC by means of an exclusive provider contract. We accordingly hold that Henderson v. Knoxville has been legislatively overruled by the Hospital Authority Act.

## B. Decision to Close the Staff of the Imaging Department

The parties in this case agree that they are contractually bound by the medical staff bylaws. See Lewisburg Cmty. Hosp., Inc. v. Alfredson, 805 S.W.2d 756, 759 (Tenn. 1991) (holding that "a hospital's bylaws are an integral part of its contractual relationship with the members of its medical staff"). The defendants allege that the medical staff bylaws were violated because the Board decided to close the staff of the Imaging Department without first receiving input from the medical staff. This contention is without merit.

"When resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." Guiliano v. Cleo, Inc., 995 S.W.2d 88, 95 (Tenn. 1999). If a contract's language is clear and unambiguous, then the literal meaning of the language controls the outcome of the contract dispute. See Planters Gin Co. v. Fed. Compress & Warehouse Co., 78 S.W.3d 885, 890 (Tenn. 2002).

Section 14.1D of the bylaws gives the medical staff a consultative role in exclusive contracting. The plain language of this provision states that "[t]he Medical Staff, through the Medical Executive Committee, with medical staff approval, shall review and make recommendations to the Board regarding issues related to the exclusive arrangements for physician and/or professional services, prior to . . . *the decision to execute* an exclusive contract in a previously open department or service." (Emphasis added).

The Board decided to seek proposals for an exclusive provider contract for the Imaging Department. An RFP was sent out prior to any feedback from the medical staff. The RFP specifically stated that it "does not constitutes [sic] an offer" and that the hospital "is not obligated hereby or by any response to enter into any particular agreement or any agreement whatsoever." Each of the defendants was present when the medical staff, in accordance with section 14.1D, reviewed the RFP and gave its recommendation to the Board. The medical staff voted conditionally to approve the closure of the staff of the Imaging Department and to support Putnam as the contracting party. At the time of this appeal, the Board had not selected an exclusive provider nor negotiated a contract for exclusive services; thus, no *decision to execute* an exclusive contract has been made. Moreover, it is clear under the bylaws that the medical staff's input is advisory only and that the Board retains the ultimate decision-making authority. Therefore, we conclude that there was no violation of section 14.1D of the bylaws.

## C. Necessity of a Hearing

If the Authority executes an exclusive provider contract with a competing group of radiologists, the defendants contend that they are entitled to a hearing under the medical staff bylaws because this exclusive contract would effectively terminate their privileges. This contention is without merit.

Article XVI of the medical staff bylaws contains a "fair hearing plan." Under the bylaws, only certain recommendations or actions,[2] if deemed "adverse,"[3] entitle a member of the medical staff to a hearing. For example, if deemed adverse, the reduction, suspension, or revocation of clinical privileges would entitle a physician to a hearing under the bylaws.

---

[2] Section 16.1-1 lists the recommendations or actions that entitle the practitioner to a hearing:

The following recommendations or actions shall, if deemed adverse pursuant to Section 16.1-2, entitle the practitioner affected thereby to a hearing:
A. Denial of initial staff appointment,
B. Denial of reappointment,
C. Suspension of staff appointment,
D. Revocation of staff appointment,
E. Denial of requested modification of staff category,
F. Reduction in staff category,
G. Limitation of admitting prerogatives,
H. Denial of requested department assignment,
I. Denial of requested clinical privileges,
J. Reduction in clinical privileges,
K. Suspension of clinical privileges,
L. Revocation of clinical privileges,
M. Terms of probation,
N. Requirement of consultation,
AND/OR
O. Letter of admonition or letter of reprimand.

[3] Section 16.1-2 of the bylaws provides when a recommendation or action is deemed adverse:

A recommendation or action listed in Section 16.1-1 shall be deemed adverse action only when it has been:
A. Recommended by the Medical Executive Committee,
OR
B. A suspension continued in effect after review by the Medical Executive Committee and/or the board,
OR
C. Taken by the board contrary to a favorable recommendation by the Medical Executive Committee under circumstances where no prior right to a hearing existed,
OR
D. Taken by the board on its own initiative without benefit of a prior recommendation by the Medical Executive Committee,
OR
E. Imposed automatically.

According to the RFP, medical staff access to the Imaging Department would terminate when an exclusive contract for the Imaging Department's operation and administration is executed. Thus, if an exclusive provider contract is awarded to a group of physicians other than Putnam, the defendants' clinical privileges will necessarily be terminated. The defendants contend that this automatic loss of clinical privileges would be an adverse action under section 16.1-2 of the bylaws, and so they would be entitled to a hearing. We disagree.

Section 14.1D of the bylaws plainly contemplates the Board entering into an exclusive provider contract. It provides that the medical staff's input regarding the closure of a department's staff is advisory only and that the Board retains the ultimate decision-making authority. "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention . . . ." Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc., 521 S.W.2d 578, 580 (Tenn. 1975). All contractual provisions should be construed in harmony with each other, if possible, "to promote consistency and to avoid repugnancy between the various provisions of a single contract." Guiliano, 995 S.W.2d at 95. Accordingly, we hold that the loss of clinical privileges resulting from the execution of an exclusive provider contract does not constitute the reduction, suspension, or revocation of clinical privileges for purposes of the fair hearing procedures mandated by the medical staff bylaws.

This construction is consistent with the intent of the Hospital Authority Act. A hearing under the present circumstances would be futile because the Hospital Authority Act gives public hospitals the authority to make a business decision to close the staff of a hospital department by means of an exclusive provider contract. See, e.g., Tenet Health Ltd. v. Zamora, 13 S.W.3d 464, 471 (Tex. App. 2000) (noting that "if each and every decision that affected a physician's practice were deemed to 'revoke' or 'modify' staff privileges, a hospital could make precious few decisions without becoming mired in hearings"); E. Tex. Med. Ctr. Cancer Inst. v. Anderson, 991 S.W.2d 55, 63 (Tex. App. 1998) (stating that "[t]he purpose of such a hearing could not be to override administrative decisions regarding the operation of [a hospital]"). A hospital's business judgment, such as a decision to close the staff of a department, is due great deference. See, e.g., Armstrong v. Bd. of Dirs., 553 S.W.2d 77, 79 (Tenn. Ct. App. 1976). Therefore, if the Authority executes an exclusive provider contract under the present circumstances, the defendants would not be entitled to a hearing on this matter.

Lewisburg Community Hospital, Inc. v. Alfredson, 805 S.W.2d 756, 759 (Tenn. 1991), does not demand a different result. In Alfredson, we concluded that a radiologist, Alfredson, was entitled to a hearing under the medical staff bylaws when his clinical privileges were significantly reduced due to the hospital entering into a new exclusive provider contract. Id. at 762. In addition to the medical staff bylaws, however, the contractual relationship between Alfredson and the hospital was defined by a separate written contract. There was a breach of contract in Alfredson because: 1) the separate written contract between the parties did not permit the hospital to reduce Alfredson's privileges without cause; and 2) a reduction in Alfredson's privileges for cause triggered a right to a hearing under the bylaws. Our conclusion that there was a breach of contract was based in part upon the removal of a provision in the parties' separate contract that would have automatically terminated Alfredson's clinical privileges if his exclusive provider contract was terminated without

cause. We explained that "[h]ad [the hospital] not made that business decision, Alfredson would have no claim for breach of contract." Id. at 759.

By agreeing to remove the contractual provision permitting automatic termination of Alfredson's privileges, the hospital was agreeing to either continue his privileges after termination of his exclusive provider contract or to provide him with some type of process prior to the termination of his privileges. Because Alfredson's privileges could not be reduced without cause, the bylaws entitled him to a hearing on the question of cause. At a hearing, Alfredson could presumably show that there was, in fact, no cause to reduce his privileges. The contractual relationship between the parties in the present case does not preclude the Authority from closing the staff of a department for reasons unrelated to cause. Here, the Board has the express authority to enter into an exclusive provider contract. Thus, unlike Alfredson, the defendants in the present case have no issue to be heard.

In summary, the bylaws' fair hearing provisions are inapplicable to the defendants in this case. Accordingly, there will be no breach of contract if the defendants are not afforded a hearing upon the closure of the Imaging Department's staff.

Finally, the defendants contend that Tennessee Code Annotated section 68-11-227 governs the ability of the hospital to terminate medical staff privileges in this case. The defendants, however, failed to raise this argument in the courts below. As a general rule, "questions not raised in the trial court will not be entertained on appeal." Lawrence v. Stanford, 655 S.W.2d 927, 929 (Tenn. 1983); see also Chadwell v. Knox County, 980 S.W.2d 378, 384 (Tenn. Ct. App. 1998) (refusing to consider a theory that was raised for the first time on appeal). Therefore, we decline to address whether Tennessee Code Annotated section 68-11-227 governs this case.

D. Constitutionality of Closure without a Hearing

1. Impairment of Contract

The defendants argue that the Hospital Authority Act impairs the contract between themselves and CRMC. This argument is without merit. Both the federal and state constitutions prohibit laws that impair the obligation of a contract. See U.S. Const. art I, § 10, cl. 1; Tenn. Const. art. I, § 20. Because we hold that the defendants are not entitled to a hearing under the medical staff bylaws, the Hospital Authority Act does not impair this contract. Moreover, there can be no impairment of contract in this case because the Hospital Authority Act, which authorizes the hospital to enter into an exclusive provider contract, predated the enactment of the bylaws.

2. Due Process

The defendants assert that the loss of clinical privileges that would necessarily follow from CRMC's execution of an exclusive contract for imaging services with another group of physicians would violate their due process rights as guaranteed by the Fourteenth Amendment to the United

States Constitution unless they are given a hearing before losing these privileges.  This contention is without merit.

The Due Process Clause of the Fourteenth Amendment provides:  "[N]or shall any state deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  It is well established that the due process protections of the Fourteenth Amendment do not come into play unless there is some action on the part of the State.  See Shelley v. Kraemer, 334 U.S. 1, 13 (1948); State ex rel. Hawkins v. Luttrell, 424 S.W.2d 189, 190 (Tenn. 1968); State ex rel. Johnson v. Heer, 412 S.W.2d 218, 219 (Tenn. 1966).  Therefore, in order to state a cause of action for a due process violation under the Fourteenth Amendment, state action must be alleged.  The Authority in this case is a public hospital authority, which was established pursuant to state statute.  Thus, the parties agree that the Authority is a state actor for purposes of Fourteenth Amendment analysis.

In order to state a cause of action for a due process violation under the Fourteenth Amendment, deprivation of a liberty or property interest must also be alleged.  The defendants argue that their clinical privileges at CRMC constitute a property interest that is protected from unfair deprivation under these circumstances.  We disagree.  In addressing a claim of an unconstitutional denial of procedural due process, we must determine whether the defendants' interest rises to the level of a protected interest.  See Rowe v. Bd. of Educ., 938 S.W.2d 351, 354 (Tenn. 1996).  "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Bd. of Regents v. Roth, 408 U.S. 564, 576 (1972).  The federal constitution does not create property interests.  See id. at 577; Rowe, 938 S.W.2d at 354.  Instead, property interests are created and defined by "rules or mutually explicit understandings that support [an individual's] claim of entitlement to the benefit and that he may invoke at a hearing."  Perry v. Sindermann, 408 U.S. 593, 601 (1972).

As established above, the medical staff bylaws do not entitle the defendants to a hearing when the hospital enters into an exclusive provider contract.  The bylaws, therefore, do not give the defendants a reasonable expectation that they will be given notice and a hearing before their clinical privileges are terminated if the hospital enters into such a contract.  See, e.g., Bleeker v. Dukakis, 665 F.2d 401, 403 (1st Cir. 1981) (holding that "[t]his lack of any reasonable expectation of continued employment suffices to establish the lack of 'property' in the constitutional sense, and hence the lack of a viable due process claim").  To the contrary, the bylaws clearly contemplate exclusive contracting.

Furthermore, due process protections are not triggered when the process would not serve any useful purpose or result in a remedy.  See, e.g., Codd v. Velger, 429 U.S. 624, 627 (1977).  Because the Authority's decision to close the staff of the Imaging Department is a business decision, a due process hearing would be purposeless.  See, e.g., Major v. Mem'l Hosp. Ass'n, 84 Cal. Rptr. 2d 510, 521 (Cal. Ct. App. 1999) (stating that "the requirement of a proceeding with minimal due process prior to termination of a physician's staff privileges is not applicable if it is the result of a quasi-legislative act by the hospital," such as one to close the staff of a hospital department by means of

an exclusive contract); <u>Abrams v. St. John's Hosp. & Health Ctr.</u>, 30 Cal. Rptr. 2d 603, 607 (Cal. Ct. App. 1994) (stating that "when terminations of staff privileges are incidental to a hospital's reorganization of one of its departments . . . the terminations are the result of administrative/quasi-legislative decisions, rather than adjudicatory/quasi-judicial decisions about a doctor, and hence do not require a due process hearing"). The parties have stipulated that the defendants' competence is not at issue. Because the defendants' professional competence has not been questioned, they have no property interest entitled to due process protection. <u>See</u> <u>Roth</u>, 408 U.S. at 573 (observing that if a person's "good name, reputation, honor, or integrity" is at stake because of what the government is doing to him, then due process requires notice and a hearing). Thus, under the circumstances in this case, we hold that the defendants have no due process right to notice and a hearing if their privileges are terminated due to the closure of the staff of the Imaging Department.

## IV. CONCLUSION

In conclusion, we hold that the Hospital Authority Act permits the Authority to close the staff of the Imaging Department by means of an exclusive provider contract, that the Board's decision to close the staff of the Imaging Department did not violate the medical staff bylaws, and that the defendants are not legally or constitutionally entitled to a hearing if their clinical privileges are terminated upon the execution of such a contract. Thus, we affirm the judgment of the Court of Appeals.

Costs of this appeal are taxed against the appellants – William M. Humphrey, M.D.; John P. Limbacher, M.D.; Daniel F. Coonce, M.D.; George O. Mead, M.D.; and Putnam Radiology, P.C. – and their sureties, for which execution may issue if necessary.

_____
JANICE M. HOLDER, JUSTICE